# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
April 14, 2004 Session

## THOMAS W. GILLAND v. JANET FAYE GILLAND

**Appeal from the Circuit Court for Davidson County**
**No. 94D-3569     Muriel Robinson, Judge**

**No. M2002-02276-COA-R3-CV - Filed November 9, 2004**

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed in Part and Reversed in Part**

## JANET FAYE GILLAND V. THOMAS W. GILLAND

**Appeal from the Juvenile Court for Davidson County**
**No. 2019-59347   Betty Adams Green, Judge**

**No. M2002-02770-COA-R3-JV**

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed in Part, Reversed in Part and Modified**

The parents in this child support proceeding have three children – twins conceived during their marriage and one child conceived after their divorce. Because of pre-2003 jurisdictional restraints, proceedings to set child support were simultaneously pending in both the Circuit Court for Davidson County and the Juvenile Court for Davidson County. The juvenile court awarded the mother a $23,273.50 judgment for retroactive child support for the youngest child and based the father's prospective child support obligation on his ability to earn $40,000 per year. The circuit court, without considering the juvenile court's order, calculated the father's child support for the twins based on $25,761, the imputed annual income in the Child Support Guidelines, and then increased the amount because of extraordinary medical expenses of one of the twins. The mother has appealed the circuit court's decision to base the father's child support for their two older children on $25,761 per year rather than on $40,000 per year. The father has appealed both judgments. He asserts that the juvenile court erred by basing his child support for the parties' youngest child on a $40,000 annual income and by failing to grant him requested credits against his retroactive child support. He also complains that the circuit court erred by increasing his child support because of the medical expenses of one of the twins and the combined effect of the two judgments which require him to pay

53% of his net income in child support, rather than 41% as provided in the Child Support Guidelines. We have determined that the juvenile court's judgment for retroactive child support should be vacated because the father is entitled to credit for his voluntary child support payments. We have also determined that the father's child support obligation for all three children should be based on $40,000 per year and that the combined amount of child support obligation should be 41% of his net income, with an upward adjustment for the extraordinary medical expenses of one of the twins. Finally, based on the 2003 statutes affecting the jurisdiction of the juvenile and circuit courts, we have determined that the proceeding in the juvenile court should be transferred to the circuit court and that all future matters regarding these children should be adjudicated in the circuit court.

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and PATRICIA J. COTTRELL, J., joined.

D. Scott Parsley and Joshua G. Strickland, Nashville, Tennessee, for the appellant, Janet Faye Gilland.

Andrew M. Cate, Nashville, Tennessee, for the appellee, Thomas W. Gilland.

**OPINION**

Two separate child support actions are consolidated on appeal. They involve the same litigants, two parents and their three children. The appeal from the Fourth Circuit Court for Davidson County pertains to the couple's two older children. The parties were required to return to circuit court for modification of child support for the two children born during the marriage because child support for the two older children was originally set by the circuit court when they divorced. The appeal from the Juvenile Court for Davidson County pertains to the couple's third and youngest child, who was born after the couple divorced.

The juvenile court action arises from Mother's petition to establish paternity and to set support for the benefit of the parties' third child. The juvenile court set support based on Father's ability to earn $40,000 annually and made the award retroactive to the child's birth, resulting in an arrearage judgment of $23,273.50.

The circuit court action arises from Mother's petition to change custody and set support for the two older children. The circuit court awarded custody of the two older children to Mother[1] and set Father's support obligation based on an imputed income pursuant to the child support guidelines. The imputed income then in effect was $25,761 per annum.

Mother appeals the circuit court judgment arguing the award should have been based on Father's ability to earn $40,000 – as determined by the juvenile court – instead of applying an imputed income of $25,761 pursuant to the guidelines. Father appeals the judgments of both courts.

---

[1]This is not expressly stated in the order but it is stated in the parenting plan.

He argues that the circuit court erred by deviating from the guidelines without making written findings to support a deviation, an additional $151 for extraordinary medical expenses.[2] Father also argues that the aggregate support obligation for three children should be 41%, not 53% of his net income.[3] With reference to the juvenile court action, Father raises the same issues – his ability to earn and the aggregate percentage of his net income for support plus two additional issues. He asserts that the juvenile court erred by not giving him a credit of $27,270 for support payments voluntarily made prior to the entry of a support order and asserts that the court erred by assessing Mother's attorney fees against him.

A brief history is in order. Two children, twins, were born during the marriage. Father and Mother obtained a divorce in July 1995. Father was designated the primary custodial parent and Mother was ordered to pay $50.00 per week in child support. Father and Mother lived together "on and off" after the divorce. Father moved to Florida in 1996 taking the twins with him. Mother subsequently moved to Florida and lived with Father "on and off." Their third child was born in February 1998. Several months later Mother returned to Tennessee with the children.[4] Father remained in Florida for a few months and then he, too, returned to Tennessee. By this time the bloom had faded one last time on the on-again, off-again relationship. By 2000, Father had married another woman, and Mother had filed the actions at issue.

Father is 47 years old with a ninth grade education. His financial record in recent years includes successes and failures.[5] Despite his lack of formal education, Father has enjoyed business successes. In 1986, he started a business known as Maximum Communication Services, Inc., that sold and serviced used business telephone systems. Maximum proved profitable and provided an income to Father of well in excess of $40,000 per year. Father's tax returns for the last three years Maximum was in business reported gross income of $84,310 in 1997, $136,564 in 1996, and $58,568 in 1995. He also owned and operated a video store from 1990 to 1996. He sold the video store in 1996 for $76,000. He closed the telephone business in 1997 at which time he began trading stock[6] but with dismal results. His 1999 tax return reported a negative income of $4.00 and his 1998 tax return reported an income of $457.00. Despite such abysmal earnings, he claims that trading stock is his best opportunity to earn a good income.

---

[2]The circuit court also increased child support by $150 per month because Father failed to exercise visitation. Father does not contest the finding that he failed to exercise visitation or the $150 per month increase.

[3]Father was ordered to pay 32% for support of the two older children and 21% for the third child.

[4]Mother moved back to Tennessee with only the youngest child, but within two weeks the twins returned to Tennessee to live with their mother and sibling.

[5]The evidence presented to the circuit court was substantially identical to that presented to the juvenile court concerning Father's income and efforts, or the lack thereof, to earn an income.

[6] Father identifies himself not as a "day trader" but a "swing trader."

Though claiming to have no net income for the two years preceding the hearings at issue, Father admits enjoying a comfortable standard of living. He primarily lives off of his assets and his wife's income.[7] Their joint tax return for 2000 reported an adjusted gross income of $92,988, almost all of which was his wife's income. Father states that his wife is and has been the breadwinner since they married in 2000. The home he lives in and the vehicles he uses -- a Mercedes automobile and a Harley-Davidson motorcycle – are owned or leased by his wife.

Mother claims Father is willfully underemployed and refuses gainful employment. She states that Father has admitted that he is "able bodied" and capable of earning income if he were to get a job and though his self-employment as a stock trader has yielded little to no income for the two years preceding the hearings below, he refuses to accept other employment.

When reviewing a trial court's decision to set the amount of child support, we apply the "abuse of discretion" standard. *State ex rel Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000). While the trial court has discretion in making awards of child support, that discretion must be exercised within the strictures of the child support guidelines. *Berryhill v. Rhodes*, 21 S.W.3d. 188, 193 (Tenn. 2000).

Our review of a trial court's findings of fact is *de novo* upon the record of the trial court accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). Unless there is an error of law, we must affirm the trial court's decision as long as the evidence does not preponderate against the findings. *Umstot v. Umstot*, 968 S.W.2d 819, 821 (Tenn. Ct. App. 1997).

The weight, faith and credit to be given to a witness' testimony lies with the trial judge in a non-jury case because the trial judge had an opportunity to observe the manner and demeanor of the witness during their testimony. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991); *Weaver v. Nelms*, 750 S.W.2d 158, 160 (Tenn. Ct. App. 1987). There is no presumption of correctness with respect to the trial court's conclusions of law. *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 35 (Tenn. 1996) and Tenn. R. App. P. 13(d).

## Two Parents, Three Children and One Too Many Courts

When Mother filed her parentage and child support action for the benefit of the couple's third child in 2000, the juvenile court had exclusive, original jurisdiction over such proceedings.[8] Thus,

---

[7]Father states that he supports the children with the sale of assets he received from the closing of his phone business, the sale of his video store and proceeds from the sale of his guns and truck and homes he formerly owned in Hermitage, Tennessee and in Florida. He further states that he relies on his wife's income for his support.

[8]In 2000, when the action was filed by Mother, Tenn. Code Ann. § 37-1-103(a)(2) afforded the juvenile court exclusive original jurisdiction over parentage matters. The 2003 amendment deleted (a)(2) which read: "All cases to establish paternity of children born out of lawful wedlock; to provide for the support and education of such children, and
(continued...)

Mother properly filed the action in the only court that had jurisdiction, the juvenile court. She also filed for modification of child support for the two older children in 2000 in the only court that had jurisdiction over that matter because that court presided over their divorce and awarded child support for the two older children. Tenn. Code Ann. § 36-5-101(a)(1); Tenn. Code Ann. § 36-6-101(a)(1); *Kane v. Kane*, 547 S.W.2d 559, 560 (Tenn. 1977); *Roble v. Roble*, 295 S.W.2d 817, 818 (Tenn. Ct. App. 1956). Thereafter, in 2001 and 2003, the legislature made significant changes in jurisdiction relative to parentage actions. As a result, the circuit and chancery courts now have concurrent jurisdiction with the juvenile court.[9] *See* Tenn. Code Ann. §§ 37-1-104 and 36-2-307. The juvenile court no longer has exclusive, original jurisdiction. *See P.E.K. v. J.M.*, 52 S.W.3d 653, 660 (Tenn. Ct. App. 2001)(juvenile court no longer has exclusive jurisdiction over paternity matters). Now the juvenile court and "any trial court with general jurisdiction" may hear parentage cases. Tenn. Code Ann. § 36-2-307. As a result, one court, not two, can and should hear matters such as this in the future so that much of the cost, confusion and inconsistent rulings presented here can be avoided. Of more significance to the parties here, one court can and shall preside over all of the matters at issue from this point forward.[10]

### Support for three children

Father's asserts that his support obligation for the three children, all of whom live with Mother, should be based on 41% of his net income, the presumptive amount in the guidelines for three children, not 53%. Father is correct.

When two parents have three children, all of whom reside with one parent, the support should be set at 41% of the obligor's net income, the percentage established in the guidelines for three children, unless a deviation is appropriate. This should be the case even though two courts are responsible for setting support. Had the two cases been heard by one judge, it is doubtful that judge could have justified setting Father's support based on 53% of his net income instead of the presumptive 41%. Had one judge presided over both cases by interchange or designation, the parties and the courts would have avoided the unnecessary expense of time and money resulting from two courts, and their personnel, presiding over two hearings wherein the parties presented basically the same evidence twice – particularly evidence pertaining to Father's income. Most importantly such a procedure would have avoided the inconsistent judgments. We, however, recognize this was not required of the parties or the courts. Thus, it was not error to have conducted separate hearings in

---

[8](...continued)
to enforce its orders."

[9]Tenn. Code Ann. § 37-1-104(f) provides that the juvenile court has concurrent jurisdiction with the circuit and chancery court of proceedings to establish the paternity of children born out of lawful wedlock and to determine any custody, visitation, support, education or other issues regarding the care of children born out of wedlock. Tenn. Code Ann. § 36-2-307 provides that any trial court with general jurisdiction shall have jurisdiction of an action to establish parentage of a child (this statute does not apply to Shelby County).

[10]Tenn. Code Ann. § 37-1-103(c) permits the juvenile court to transfer a case such as this to a circuit court exercising domestic relations jurisdiction.

separate courts. However, since jurisdiction changed in 2001 and 2003, future actions such as these should be filed in and presided over by one court.

The guidelines provide that the "child support award is based on a flat percentage of the obligor's net income as defined in paragraph (4) below depending on the number of children for whom support is being set in the instant case." Tenn. Comp. R. & Regs. 1240-2-4-.03(2). The guidelines provide that the percentage of net income of the obligor for three children is 41%, for two children is 32% and for one child is 21%. Tenn. Comp. R. & Regs. 1240-2-4-.03(5). The guidelines further provide that the percentage that is applicable shall correspond to the number of children for whom support is being set "in the instant case." The juvenile court set support for the instant case it was responsible for at 21%, pursuant to the guidelines, because that court was responsible for setting support for the benefit of one child. The circuit court set support for the instant case it was responsible for at 32%, pursuant to the guidelines, because that court was responsible for setting support for the benefit of two children. We believe the two cases should be treated as one case – the instant case – because the child support issues pertain to the one father, one mother and their three children.[11]

### Proceedings in Juvenile Court

The action in the juvenile court was commenced in 2000 when Mother filed a petition to establish paternity for the couple's third child. On December 4, 2001, the juvenile court referee set child support in the amount of $523 per month based on "Father's admitted ability to earn $40,000 a year." On February 13, 2002, the referee assessed child support on Father's ability to earn $40,000 per year, made the award retroactive to the child's birth, for a total award of $23,273.50 in retroactive support, and set Father's monthly arrearage payment at $523 per month.

Father then filed a motion for the juvenile court referee to clarify his findings, in response to which the referee essentially reaffirmed his earlier findings. Father appealed the referee's orders and requested that the juvenile court judge hear all issues pertaining to current and retroactive child support. On September 16, 2002, the juvenile court judge conducted a full evidentiary hearing following which she affirmed the referee's rulings.

---

[11]Though not a full credit as we provided above where the two support orders pertain to the same two parents and their children, all of whom live in one parent's home, the guidelines provide for adjustments for pre-existing orders of support.

   1. The priority for pre-existing orders is determined by the date of the initial order in each case. Subsequent modifications of the initial support order do not affect the priority position established by the date of the initial order for any purposes of this paragraph.
   2. When calculating the adjustments for pre-existing orders to determine the obligor's net income pursuant to this subparagraph (c), only those pre-existing orders whose initial date of entry precedes the date of entry of the initial order in the case immediately under consideration shall be included.

Tenn. Comp. R. & Regs.1240-2-4-.03(4)(c)(1) & (2).

<u>Imputed Income vs. Income Based on Ability to Earn</u>

Father testified about his income for the years 1995 through 1997 which showed yearly incomes of $58,568 for 1995, $136,564 for 1996, and $84,310 for 1997. Even though these yearly incomes were from years in which Father operated a lucrative telephone service business, these incomes are evidence of Father's ability to start and successfully operate a business. Such skills have a wide range of application and can be used for the benefit of another employer and/or for Father to start another business. There is also evidence of Father's ability to operate a business other than a telephone service business. Father testified that he owned and operated a video store for six years which he later sold for $76,000.

Father's efforts at finding a job are essentially non-existent. He testified that he looked for a job at the unemployment office in Fayetteville, Tennessee, where he now resides, "every couple of months" since 1998. The last time he inquired at the unemployment office was in March, which was six months prior to the hearing in September. Father's lack of interest in finding work is not limited to the few inquires he made. Consistently, after Father would inquire about job opportunities he would not even send a resume. He attempted to justify this job search protocol by stating that he considered it pointless, believing that all employers require their employees to have a high school diploma. While Father argues that his lack of a high school diploma severely limits his employment opportunities and virtually closes the door to employment, his efforts to obtain a G.E.D. – to qualify for the type of job he desires – are non-existent. This finding is fully supported by the fact that Father testified in the circuit court proceeding in December 2001 that he was attempting to get his G.E.D. yet nine months later – when he testified in the juvenile court proceeding – he admitted that his attempts were limited to studying for the G.E.D. on the internet.[12]

The record reveals that the court was obviously concerned that Father was closing the door to employment opportunities. This is evident from the following exchange:

THE COURT: Have you looked for jobs anywhere in Tullahoma?
FATHER: Not in Tullahoma. Besides Arnold, it's pretty slim.
THE COURT: Well, there are a number of businesses that are related to Arnold, though, over there that are technical–technological types of businesses and I was wondering.
FATHER: Your Honor, when it didn't matter what my education was, nobody asked me. I'm assuming they assumed because of what I was doing I had a high school education. It's pretty much self-trained in telecommunications.

_____

[12]We note that in the proceedings before Judge Robinson, which occurred approximately nine months earlier, Father argued that because of his lack of formal education and the closure of his business due to changing industry conditions, his ability to earn a living was limited such that trading stock was his "best" means of earning a living. The same weaknesses in Father's argument to Judge Green were exposed by Judge Robinson, yet the record in the juvenile court shows that Father made no progress towards finding a job where he can earn a living and no progress toward obtaining a high school diploma by a G.E.D.

THE COURT: But if you don't go to these places, aren't you assuming that they care now?

FATHER: I'm sorry?

THE COURT: But if you don't call these places and inquire, aren't you assuming that the lack of a high school diploma will stand in your way of working for them?

Father's response to the court's last question was quite lengthy and to a degree non-responsive but for one unintended admission. He admitted that he previously obtained a job with a company he now claims would not hire persons like him, those without high school degrees, but they did hire him. He now claims they made a mistake by hiring him. What he admitted without realizing it is that by applying for a job he was able to obtain the type of job he claims he cannot now obtain.

We are simply not persuaded by Father's argument that the closure of his telecommunications business constitutes an indefinite bar to his ability to earn a living in the telephone business or another business. Moreover, the record does not preponderate against the ruling that Father is underemployed and that he has an ability to earn $40,000.

### *De Novo* Hearing Before Juvenile Court Judge

Though not stated as a separate issue in his brief, Father argues that he was entitled to a *de novo* hearing before the juvenile court judge. Father claims he was denied a *de novo* hearing because Judge Green, after conducting a full evidentiary hearing, affirmed the referee's finding that he had the "admitted ability" to earn $40,000 per year. Tenn. Code Ann. § 37-1-107(e) does not state that a party is entitled to a *de novo* hearing; however, the statute has been interpreted by this court to entitle one to a traditional *de novo* hearing. *Kelly v. Evans*, 43 S.W. 3d 514, 515-516 (Tenn. Ct. App. 2000). Whether Tenn. Code Ann. 37-1-107(e) contemplates a traditional hearing *de novo,* as in an appeal from a general sessions court to a circuit court, or a *de novo* hearing based upon the record of the hearing before the referee was addressed in *Kelly*, 43 S.W. 3d at 515-516. Not finding a case directly on point, the court held

> [T]he language in the Statute, "shall allow a hearing" contemplates a traditional *de novo* hearing. Our conviction in this regard is buttressed by the cases of *Jarrett v. Starkey*, 1998 WL 202491 (Tenn. Ct. App.) and *Hickerson v. Finchum*, 1997 WL 21189 (Tenn. Ct. App.), wherein, although the issue was not specifically raised, it is clear that witnesses testified before the juvenile court on appeal.

*Kelly*, 43 S.W. 3d at 515-516.

The juvenile court conducted a full evidentiary hearing where the parties presented witnesses who testified before the court. Thereafter, the juvenile court judge made her ruling wherein the judge elected to affirm the referee's ruling. Though the judge affirmed the referee's ruling, the judge nonetheless conducted a full evidentiary hearing, one that qualified as a *de novo* hearing. The fact

that the judge announced her ruling by affirming the referee's previous ruling does not vitiate the fact that Father was afforded and participated in a *de novo* hearing. Thus, Father was afforded the type of hearing contemplated in Tenn. Code Ann. 37-1-107(e) and *Kelly*.

### Credit for Support Voluntarily Paid Prior to Entry of an Order

The juvenile court awarded Mother an arrearage judgment in the amount of $23,273.50. Father asserted that he voluntarily paid $27,270 in support of the youngest child prior to the entry of the support order[13] and sought an offset against the arrearage award. The juvenile court ruled adverse to Father, denying any credit for the alleged support payments.

Mother contends that the testimony raised doubts as to how much, if any, of the money was paid for the benefit of the child. She claims that Father already owed her $25,000. She testified that after the divorce she sold her home and deposited $25,000 into Father's account and that Father had not repaid the money. It is Mother's contention that the juvenile court did not accept Father's testimony that these funds were child support payments. She further contends that great weight should be given to the juvenile court's ruling since the court had the opportunity to observe the witnesses and assess their credibility.

The juvenile court judge did not make findings of fact on this issue; therefore, there is nothing found as a fact to which we may attach the presumption of correctness. Thus, we will review the record *de novo* to determine where the preponderance of the evidence lies. *Lee v. Lee*, 66 S.W.3d 837, 843 (Tenn. Ct. App. 2001) (citing *Brooks v. Brooks*, 992 S.W.2d 403, 405 (Tenn. 1999)). The juvenile court judge ruled in Mother's favor by affirming the referee's ruling on this issue; however, the referee reached his conclusion without considering Father's evidence on the issue because the referee excluded Fathers's evidence. Mother had objected to the entry of such evidence because Father had failed to list it as an exhibit. The referee sustained Mother's objection. The trial court considered the evidence that had been excluded by the referee and affirmed the referee's decision.

Based on our *de novo* review of the evidence, we find that the evidence preponderates against the court's ruling. Father testified that he paid Mother specific amounts of money for a period of time following the child's birth. Mother did not deny receiving the money; to the contrary, she essentially admitted receiving the money. Mother's challenge to the payments by Father arises from and pertains to their dispute regarding the $25,000 she deposited into his account following the sale of her house. She claims Father has not repaid the $25,000 he allegedly owes her. She may be right; however, we are not ruling on whether Father owes her $25,000 from the sale of her house. He testified that he paid her amounts in excess of the arrearage judgment following the child's birth as support for the child. She does not deny receiving the funds, she only challenges the reason for its payment. Considering all of the evidence before us we find that the evidence preponderates in favor

---

[13]The alleged payments were remitted from February 23, 1998, to November 2001, when the juvenile court support order went into effect.

of the finding that Father remitted funds as support in excess of the arrearage judgment and therefore is entitled to credit for the payments.

Father is entitled to a credit in an amount not to exceed the retroactive child support arrearage set by the juvenile court. That amount is $23,273.50. However, Father is not entitled to credit for monies paid in excess of the arrearage award because amounts that exceed the support order are viewed as a gratuity or voluntary contributions. *See* 27C, C.J.S. *Divorce* § 672 (FN 74) (1986).[14] Here, the payments were made by Father voluntarily and there is no testimony in the record to establish that the payments in excess of the required amount were for the child's necessaries. Thus, Father is not entitled to a credit in excess of the arrearage.

Attorney Fees

Father argues that Mother should pay her own attorney fees contending that her efforts were aimed at setting support at an excessive level and to prevent him from receiving credit for support he voluntarily paid. Moreover, he argues that her actions resulted in an unnecessary increase in the legal fees incurred by both parties. Mother relies on Tenn. Code Ann. § 36-5-103 to justify the award of attorney fees because she incurred the fees seeking to enforce child support and that she is without means to pay all of the legal fees. She also asserts that she is entitled to attorney's fees on appeal because she is protecting the child support award of the trial court.

The juvenile court in this case awarded Mother attorney fees of $2,500. A trial court is vested with wide discretion as to the allowance of attorney fees and this Court will not interfere except when an abuse of that discretion is shown. *Threadgill v. Threadgill*, 740 S.W. 2d 419, 426 (Tenn. Ct. App. 1987) (citing *Marmino v. Marmino*, 238 S.W. 2d 105, 107(1950)). This Court will not interfere with such an award unless the evidence preponderates to the contrary. *Nelson v. Nelson*, 106 S.W. 3d 20, 25 (Tenn. Ct. App. 2002). Father has presented no evidence that suggests that the trial court abused its discretion in making the award.

We decline Mother's request for attorney fees on appeal. An award of attorney fees is inappropriate where both parties are partially successful on appeal. *Storey v. Storey*, 835 S.W. 2d 593, 598 (Tenn. Ct. App. 1992); *Houghland v. Houghland*, 844 S.W. 2d 619, 623 (Tenn. Ct. App. 1992).

---

[14]Credit for voluntary payments is allowed when the payment is for the children's necessaries which are not supplied by the custodial parent. *Oliver v. Oczkowicz*, 1990 WL 64534 at * 2 (Tenn. Ct. App. May 18, 1990); *Sutton v. Sutton*, No. 180, 1991 WL 16234 at *1 (Tenn. Ct. App. Feb. 12, 1991); *Netherton v. Netherton*, No. 01-A-01-9208-PB00323, 1993 WL 49556 at * 2 (Tenn. Ct. App. Feb. 26, 1993); *Duckett v. Duckett*, C/A No. 03A01-9506-CV-00198, 1996 WL 57943 at *3 (Tenn. Ct. App. Feb 13, 1996); *Shoemake v. Kendrick*, No. E2000-01318-COA-R3-CV, 2001 WL 548962 at *7 (Tenn. Ct. App. May 24, 2001).

## Proceedings in Circuit Court

The circuit court appeal is limited to Father's obligation to support the two older children. The circuit court set Father's support obligation at $370 per month based on an imputed income of $25,000.[15] Mother had requested $1,158 per month.

Mother and Father presented arguments and evidence to the circuit court that were nearly identical to those presented to the juvenile court concerning the ability to earn income versus imputing income pursuant to the guidelines.

The circuit court found Father underemployed and set support at $370 based on "imputed income" pursuant to the child support guidelines. The circuit court made three additional findings that increased Father's support obligation from $370 to $771 per month. The court found that one of the children had extraordinary medical expenses and awarded an additional $151 per month. The court also found that Father had failed to exercise his visitation privileges and increased the award by an additional $150 per month. In addition, the court awarded a judgment for an arrearage and ordered Father to pay $100 per month on the arrearage judgment for a total of $771.[16]

### Imputed Income vs. Ability to Earn

Mother claims Father is willfully underemployed and refuses gainful employment even though his self-employment as a stock trader[17] has yielded little to no income in two years. As stated above, she emphasized the fact that Father admitted he is "able bodied" and is capable of earning income if he were to get a job. She argues that there was sufficient evidence before the court for it to have held that Father's ability to earn was greater than the imputed income of $25,000.

Father asserts there was no evidence of his ability to earn and therefore the circuit court correctly set his income at the imputed income standard. Father specifically argues that his previous income from the telephone service business is irrelevant because that ability – opportunity -- disappeared due to changes in the industry in 1997. He further argues that his ability to earn income is greatly limited due to the fact that he has a ninth grade education.

---

[15] The circuit court imputed income at the "round number" of $25,000 instead of $25,761, the amount stated in the guidelines. Under the current guidelines, the imputed income is $28,145.

[16] The circuit court order, which was entered January 11, 2002, was modified by an order entered February 11, 2002. The modification was in response to Father's Motion to Clarify the retroactive award. The later order superseded paragraph 3 of the earlier order, reducing the arrearage for the special medical needs of the child from $4,026 to $906. All other provisions not expressly modified were to remain in full force and effect.

[17] Father asserts that he is not a day trader, but is more accurately described as a swing trader. For purposes of this appeal the terminology used does not matter.

The circuit court set Father's support based on the imputed income in the child support guidelines. Tenn. Comp. R. & Regs. 1240-2-4-.03(3)(e). When establishing an initial order of support, gross income for the current and prior years should be determined by imputing annual income pursuant to the guidelines if there is no evidence of income, such as tax returns, check stubs, or other information for determining current ability to support or ability to support in prior years, and if the court has no other reliable evidence of the obligor's income or income potential. Tenn. Comp. R. & Regs. 1240-2-4-.03 (3)(e). When the circuit court set Father's support, the imputed income under the guidelines was $25,761. *Id.* The guidelines have since been amended and imputed income was increased. It is now $28,145.00.[18] *Id.*

Imputing income is not appropriate if there is "other reliable evidence of obligor's income or income potential." Tenn. Comp. R. & Regs. 1240-2-4-.03(3)(e). The record contains evidence of substantial earnings as recent as 1997. Specifically, there are tax returns that reveal Father's gross income was $84,310 in 1997, $136,564 in 1996, $58,568 in 1995. We find this to be reliable evidence of Father's income or income potential, which precludes using the imputed income amount.

In addition to providing that imputing income is not appropriate if there is other reliable evidence of the obligor's income or income potential, the guidelines also provide that "[i]f an obligor is willfully and voluntarily unemployed or underemployed, child support shall be calculated based on a determination of potential income, as evidenced by educational level and/or previous work experience." Tenn. Comp. R. & Regs. 1240-2-4-.03(3)(d). The evidence before us clearly established that Father made a conscious choice to abandon the skills he had acquired in the telecommunications industry. The evidence also clearly established that he has labored by trading stocks for the past two years and has been rewarded with net earnings of less than $500 over these two years. Though Father's labor as a stock trader has been a total failure, he testified that he wanted to trade the market and that he was taking care of his responsibilities but if he could not make a living he could get a job in the phone business. This enlightening testimony resulted from a series of questions presented to Father by the court, a portion of which is as follows:

> THE COURT: Phone systems. You know all about phone systems. Well, have you made application to--
> FATHER: I don't know about most systems, whatever changes they've made since '97.
> THE COURT: Okay. So why aren't you working for some of these phone companies? Have you filed application with them? Obviously, you're very knowledge [sic] in your business. They would provide insurance and have an employee package. And you could have a regular job. With your expertise, why haven't you applied to these things?
> FATHER: Well, one, I wanted to trade the market.
> THE COURT: You wanted to trade stock.

---

[18] This figure represents an average of the median annual income for Tennessee families as provided by the 1999 U S Census of Income and Poverty data for Tennessee Counties.

FATHER: I was taking care of my responsibilities.
THE COURT: But you can't make a living. You're telling me that because of you wanting to trade stocks, that you can't make a living really--
FATHER: Yes, ma'am, it is –
THE COURT: – to support your children adequately. So I wouldn't do that anymore if I couldn't support my children adequately.
FATHER: If it continues the way it's going, yes, I'll have to. I can get a GED and go get a job in the phone business.

Perhaps the most profound statement by Father was that "I can . . . get a job in the phone business." Ironically, Father agreed with the court that if he could not support his children by trading stocks, he should do that -- "get a job in the phone business."

It is difficult to contemplate more compelling evidence of an ability to earn than Father's own declaration that he could get a job in the phone business. While his ability to earn may not be what it was in prior years, Father admits he can earn a living. He testified that he could "get a job in the phone business."

The court's questions are also significant for they reveal the court's findings that Father was "very knowledgeable" in his business, that he "could have a regular job," and he has expertise.[19] Though each was presented in the form of a question, the court's questions expressed the affirmative findings that Father was very knowledgeable in the phone business, he had expertise and he could get a job. These findings by the circuit court are supported by the record. Father is able to work. He is just not ready and willing to work to earn a living to support his children.

Father's income in 1997, 1996 and 1995, when he worked in the telecommunication industry and the video business[20], qualifies as "other information" for determining current ability to support or ability to support in prior years and as other "reliable evidence" of Father's income or income potential. It reveals that his potential is as high at $136,564. However, Father may need to re-establish himself in the industry, either as an employee for another's business or to start up his own business(es). While we recognize this possible limitation, though temporary, we are not unmindful of Father's willful underemployment for the past few years, as evidenced by his exchange with the court shown above.

Based upon the above, we find that Father's ability to earn, while not as great as it was in 1997, 1996 and 1995, is clearly greater than the imputed income under the guidelines. Accordingly, we find that Father's ability to earn is at least $40,000 per year. Therefore, Father's support obligation should be based on an ability to earn an income of $40,000 per year. Accordingly, we

---

[19] The court stated, "With your expertise, why haven't you applied to these things?"

[20] There is no information in the record concerning Father's annual "net income" derived from the video store; there is only the evidence that he sold the store in 1996 for $76,000.

reverse and modify the circuit court's decision to set Father's income based on the imputed income and hold that Father's income must be based on his ability to earn $40,000 per year.

Additional Support

Father challenges the increase of his support obligation by $151.00 per month on the basis that one of the children has extraordinary medical expenses. Father contends it was error to award such an increase without written or specific findings. He also contends that the expenses on which the award is based are items that a child would normally require and for which an upward adjustment is not appropriate.

The guidelines are to be "applied as a rebuttable presumption in all child support cases." Tenn. Comp. R. & Regs. 1240-2-4-.02 (7). The court must make a "written or specific finding that the application of the child support guidelines would be unjust or inappropriate in that particular case" if the court determines there is evidence sufficient to rebut the presumption. *Id*. Findings that rebut these guidelines must state a justification for deviation from the guidelines. *Id*. In doing so the court must take into consideration the best interest of the child. *Id*.

Here, the circuit court made a finding from the bench that Mother incurs additional medical expenses of $151.00 per month for one of the children. A trial court's oral finding to justify a deviation from the guidelines was approved in *Koch v. Koch*, 874 S.W.2d 571, 578 (Tenn. Ct. App. 1993).

> The trial court deviated from the child support guidelines and stated for the transcribed record that the deviation was due to the enlarged visitation schedule he painstakingly prepared. The evidence does not preponderate against the trial court's finding that a deviation should be made and that the deviation made was proper. Although the trial court properly should have made a written finding concerning the reason for the deviation, the oral pronouncement by the court subsequently transcribed should suffice in this instance rather than sending this prolonged, hotly contested case back to the trial court solely for the purpose of written findings.

*Id.* at 578.

Father also contends that some of the child's expenses are no different than those of an ordinary child. The record contains testimony by Mother and the child's physician concerning the child's medical needs. Both testified in sufficient detail to explain that the child requires more medical care than a child in good health. They explained that the child must be tube fed to supplement her diet which requires additional medical supplies and that tube feeding presents hygiene issues and makes the child more prone to infections. Further, the physician testified that the child is also being treated by six additional medical specialists and describes the child as a special needs child. Extraordinary medical expenses not covered by insurance are grounds for an upward deviation. Tenn. Comp. R. & Regs. 1240-2-4-.04 (1)(c). Accordingly, we find that the circuit

-14-

court's finding, though not in writing, was sufficient and that there is substantial evidence in the record to justify an upward deviation of $151 per month.

## In Conclusion

We therefore modify the judgments to provide that Father's child support obligation for all three children shall be based on an ability to earn $40,000 per year and the amount of child support to be paid by Father shall be based on 41% of his net income (the presumptive amount for three children); affirm the upward deviation in the amount of $151 for one of the children's extraordinary medical expenses, which amount shall be in addition to the above child support award; reverse the decision of the juvenile court denying Father an offset for support provided for the youngest child and award Father an offset equal to the amount of the arrearage; and affirm the juvenile court's decision concerning attorney fees.

Furthermore, we hereby transfer the juvenile court proceeding to the Fourth Circuit Court of Davidson County, as authorized pursuant to Tenn. Code Ann. § 37-1-103(c), thus consolidating these two actions into one action for further proceedings consistent with this opinion.[21]

Costs of appeal are assessed against the parties equally.

_____
FRANK G. CLEMENT, JR., JUDGE

---

[21] The decision to transfer the juvenile court matter to the circuit court is based on the fact that the circuit court was the first to enter a support order.